# Richard Fullam, Executor of Last Will of Luke Otis, *v.* Anna Maria Rose, Appellant:

*Evidence—Handwriting—Disputed signature—Competency of witness.*

A statement by a witness that the signature to a check looked like that of the person alleged to have drawn the check, without more, is wholly insufficient to justify the admission of the check in evidence for any purpose, especially for the purpose of being used as a test paper.

*Practice, C. P.—Statements of counsel during trial—Charge of court—Misleading charge.*

It is reversible error for a trial judge to state to the jury that a paper sued on "was found among the belongings of" plaintiff's testator, when the evidence does not show where the paper was found, or when or how it came into plaintiff's possession.

In an action by an executor, it appeared that the paper sued upon was omitted from the inventory of testator's estate. The court charged that the omission of the paper from the inventory was sufficiently accounted for by the statement of plaintiff's counsel "that it was a disputed matter, and therefore it was not counted among the assets." There was nothing in the evidence on which to base the statement made by counsel. *Held,* that the charge was misleading and prejudicial to the defendant, and that a judgment for the plaintiff should be reversed.

Argued Jan. 25, 1897. Appeal, No. 346, Jan. T., 1896, by defendant, from judgment of C. P. No. 3, Phila. Co., March Term, 1892, No. 810, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Assumpsit on an instrument in writing. Before REED, J. See Fullam v. Rose, 160 Pa. 47.

Plaintiff's counsel offered in evidence the following paper, upon which the suit was brought:

" Know all men by these presents, that I, Anna Maria Rose, wife of Michael Rose, do hereby acknowledge that I have in my hands the sum of $1,000, belonging to my brother, Luke Otis, he having deposited the same with me for safe keeping, which moneys are payable to him or his heirs or assigns on demand at any time.

" Witness my hand and seal this twenty-third day of June, A. D. 1886.

her

"ANNA MARIA × ROSE. [L. S.]

mark

" MICHAEL ROSE.

" Witness present:
" A. JAMES, JR."

The material portions of defendant's testimony appear from the charge of the court below.

Plaintiff's counsel, in rebuttal, made the following offer:

I also offer in evidence a check dated September 15, 1887, on the Southwark National Bank, signed by Luke Otis, the signature to which the witness Rose identified as being that of Luke Otis. I propose to contradict Michael Rose when he said he wrote out this slip, by showing that it was written by Luke Otis, and that that handwriting is alike. Objection by Mr. Page. Overruled. Exception for defendant. [1]

The court charged as follows:

[This suit is brought by the executor of a dead man's estate, upon a certain paper which was found among the belongings of that decedent.] [3] Where the paper came from you do not know. It comes from what is known in law as the proper possessor. That is to say, executor of the one to whom at one time the document belonged; and he being dead, it is in the possession of the man who is entitled to have it. At any rate, it is in the possession of the man who is given title, if the claim is still unpaid. Of course, we do not know the history of that paper from the time it was first delivered until now, when it is made the basis of a suit. That paper constitutes a valid claim against this defendant, because the defendant, in that paper,

acknowledges herself to be the depositary, or a holder, for the
benefit of Luke Otis, her brother, whose executor is now suing
on this paper, of a certain sum of money.  If there is no expla-
nation or defense that claim is as good today as it was when it
was first created.  The defense, however, in this case is that of
payment.  It is admitted that she did, in the summer of 1886,
some time in the latter part of the month of June, I think,
receive that sum of money from the decedent, Luke Otis, whose
executor is the plaintiff in this suit; and there is evidence to
show that that money was intended to enable her to spend it
upon a house in Sea Isle city, down on the coast of New Jersey,
to enable her to carry through that undertaking.  Now, the
allegation is that in the following January, on the 10th, 1887,
this money was repaid by the defendant in this case to her
brother, and, either through error or mistake, she did not become
possessed of the document which would show that she had paid
back the money.  It is alleged, however, that a receipt was
given, which receipt has been lost by the defendant.

[Now, the plaintiff's case consists of the paper, and the fact
that he has the paper, and that is a good case, so far as it goes,
because there is no doubt that there is a liability under that
paper.  In addition to that certain corroborative evidence, which
is based upon the assumed good character of Luke Otis, the
deceased, and that he would not have retained possession of
that paper, still less would he have said that he had destroyed
it when in point of fact he had not destroyed it, although he
should, if he had been paid the money, have delivered it up.
In other words, the plaintiff's case is, in the first place, you
have the paper, and second, you have a course of conduct cred-
ited Luke Otis, which is not consistent with good faith and
honesty on his part, and not such as you would suppose a
brother and honest man, living on good terms with his sister,
would have conducted himself.] [4] Now, as against that we
have a number of witnesses.  We have, in the first place,
Mr. James, the conveyancer, who testified yesterday on the
stand that he met Luke Otis on the street—a person with whom
he was in the habit of doing business—and Otis told him that
the matter had been fixed, and Mr. James asked Mr. Otis if he
would not give him an opportunity of investing that $1,000,
and Otis said he would come around to his place and see about

it, but he never did, and not long after that he died.    Mr. James
was recalled to the stand today, and testified that his recollec-
tion more fully is, that Otis did not simply use the word " fixed,"
that useful Americanism that covers every active verb in the
language, and will express all a man's idea, nearly, but he said
he used a good English expression, not that the matter was
fixed, but that she had paid him.    Mr. James says he recollects
it, for the reason that he felt an interest in attending to this
man's business, and wanted to invest the money for him, either
in a mortgage or something of that kind, and he looked upon
Mr. Otis as being possessed of this $1,000, and as a possible
customer, and he wanted him to come down and see him.    In
addition to that we have various witnesses.    Michael Rose, the
husband of the defendant, August Gauvry, Mary Busch, Mary
Gauvry, James Hyland, Daniel Desmond and August Busch.
Mr. Rose says, in the first place, that he made this deposit slip
for the deposit of this money by Luke Otis, and that this slip
is in his handwriting, and not in that of Luke Otis.    The wit-
ness Hyland says that he had been in the habit at times of mak-
ing deposit slips for Luke Otis, but this particular deposit slip
he said was not made by him.    Rose said he remembered the
fact that he made this deposit that day, and that he was the
man who wrote out the slip for the deposit, and he states that
the money that he deposited was the money that he received
from his sister, Mrs. Rose, in settlement of this debt which
sprung out of the Sea Isle city matter.    Then we have Mr.
Busch, the tavern-keeper, and his wife.    They stated that Mrs.
Rose and her brother came in accompanied by a young man
named McCambridge, who, it is agreed by counsel, is dead, and
they stated that the money had been paid, and in addition to
the $1,000 something was said about the payment of $25.00
interest.    Then a man named Daniel Desmond says that Otis
told him that the money had been paid, and that the claim
against his sister was settled.    And Hyland testifies the same
way.    I am going over this testimony very briefly, but, I feel,
as fully as necessary.    Then we have the testimony of Mr.
Gauvry, who was a relative of these people, and he says he
remembers sending a postal card to Mr. Otis, saying that his
sister wanted to see him on important business, and he came
down the next day, and she paid him this money, and that there

was a little friendly discussion between brother and sister as to the payment of interest, the sister insisting that he should have $25.00 for the loan, which would be interest at the rate of five per centum on $1,000 for six months, which he was rather unwilling to accept until she thrust it in his pocket, and in doing so tore the edge of his overcoat pocket. In addition to that we have the evidence of Mr. Martin, who testified this morning that that day sometime between twelve and two o'clock, Mrs. Rose came to his place and got $845, which he gave her in bills of various denominations, he being the person who gathered in her rents for her. So, if the testimony of these witnesses is true, if they have not combined, on the theory of the plaintiff here, from the fact that Mr. Otis, from some source or other, which is not explained, put $1,050 in bank that day, and this fact came to the knowledge of his sister and his friends, and, based on that, drew this story. I say if you believe the testimony of the witnesses for the defendant is true, then, of course, the money was paid and your verdict should be for the defendant. Of course, what I have said as to the basis of the theory of the plaintiff here is a matter for argument, and you must determine the question yourselves. We have a number of witnesses, and their testimony is about the same, beyond some contradiction or discrepancy between the testimony they previously gave when it was tried before, and the testimony they gave at this trial. You have heard just what they were and you have heard counsel on both sides speak of them. It is argued by plaintiff's counsel that their memory is not to be trusted, and counsel for the defendant said they are simply imperfections of an honest memory; that people do not, after a long lapse of time, when they go to recite a thing again, state upon the second occasion just what they did the first time; and it is for you to say which of those two theories you will adopt. Either of them is applicable to this case.

Now, we come to one more point in the plaintiff's case, and that is the position which was taken by Luke Otis in his lifetime in regard to delivering this paper when it should have been delivered to the defendant, Mrs. Rose; that is, if the money was paid. If you view the testimony from that point it would appear that Otis not only seemed disposed to wrong the defendant in this case by keeping from her papers to which she was

entitled, and which might hereafter be a source of trouble to her, but that he went out and told a number of people, if he did so, that he had been paid this money, at the same time knowing it had been paid, and that he had this paper in his possession which he could at some future time claim the money for.     Now, if we had an exact idea of what took place at this meeting, if it did take place, between Otis and the others, if we knew that he had deliberately deceived the defendant in this case, we might then very well argue that it was unlikely that a man who would do a thing like that would imperil himself by going outside and telling people that it had been paid if it had not been paid.     On the other hand, if he remembered just what this paper was and where it was, and attached no importance to it, and said it had been destroyed and it had not, we cannot quite suppose that he did that for some future evil purpose; but the question is, does what we hear on this stand after the lapse of a very considerable length of time put us exactly where we would have been had we been present at that interview? In other words, the manner, emphasis and general conduct of the man when he said he destroyed it, if he did say so.    If, for example, he had the paper and did not want the trouble of looking it up, and turned it off by saying, "Oh, I don't know where it is ; I tore it up," or "I can't find it," in an indifferent way, we might conclude from that that he did not want to take the trouble of looking it up, and did not attach any importance to it.    If, on the other hand, he gave her his solemn assurance, knowing the importance of the paper, that he had destroyed it, because he didn't wish such paper to be in existence, and in point of fact he had not, we may assume that he intended to tell what was not true and what he knew was not true.    We do not know from the testimony of the witnesses just what took place at that interview any more than one or two of the witnesses have said, that Otis said he had destroyed the receipt. Now, whether that was a careful, deliberate statement made by a man knowing the importance of what he was saying, or whether he said it in a careless way, it is an entirely different thing, and it is for you to say which of these you will assume.    Of course, it is impossible, in my judgment, and I think it will be in yours, to suppose that these witnesses are all mistaken innocently as to what Otis told them.    These witnesses are either telling the

truth, or some of them, probably a majority of them, are deliberately perjuring themselves.   [In other words, if from some possible source we could discover that the payment had not been made, and Otis never made any such assertion, then I am very much afraid that if not all, at least a very considerable part of these people must have been saying what they knew was not so, because, while one person may very likely be wrong, it is not, to my mind, conceivable that they all should be.]   [5]   In other words, one man is likely to make a mistake, but that half a dozen people should all make a mistake in the same way seems to me very improbable, and I believe you will think so, too.   The question is, whether the witnesses are telling the truth.   We have the best authority that he had that amount of money in his possession that day, because he made a deposit of it, as shown by the books of the bank.   The plaintiff's counsel argue that the deposit is the fact on which the rest of the story is built, and it is a foundation, and not a corroboration of the defendant's case.   He argues that that is so because it must otherwise be imputed to Luke Otis that he intentionally suppressed this paper in order to make some future use of it in a way that he honestly had no right to use it.   As far as that being the case is concerned depends a good deal upon what is said at that interview, and how he said it.   On the other hand, of course, it is your duty to reconcile all the testimony in this case that can be reconciled, and when you have tried to do that, and so far as you have succeeded, you have disposed of that much of the case, so much as you cannot reconcile, then of course, you must decide which you will believe; but I must again call your attention to the fact that there is no living witness on the plaintiff's side of the case.   The dead man, of course, cannot speak, and the defendant herself, for the same reason that the plaintiff cannot speak, is prohibited from testifying.   We have this paper, as far as the original liability is concerned, and that is all we have except what we may infer from the statements given to us by the defendant's witnesses, to whom Otis is alleged to have told about the possession of this paper and his destruction of it.

Counsel for the plaintiff has pointed out to you several discrepancies in the testimony of some of the witnesses as compared with the testimony given at a previous trial.   That is a matter

for you to reconcile if you can. You have heard read to you what the witnesses testified to at the previous trial, and you have heard their testimony while on the stand in this case, and I leave that matter with you. It is not a case of witness against witness, as there are no witnesses on the plaintiff's side. The transcript from the bank shows that he made a deposit on a certain date, and an officer of the bank, Mr. Crawford, when asked about what time of the day the deposit was made, says it was somewhere between twelve and three o'clock. He says that the writing on the slip looks like Mr. Otis' writing. [The plaintiff, in order to show that Mr. Rose's recollection in this case is not to be relied on, when he said he wrote out the deposit slip, has produced a check which we may assume was signed by Luke Otis, in order to show his handwriting, and has argued to you that the handwriting on the check and that on the deposit slip are one and the same. Mr. Crawford, however, has said the writing looks like some writing he has of Mr. Otis', but the plaintiff puts in this check of Mr. Otis, and it is for you to make a comparison of those signatures.] [2] I, myself, am not an expert on handwriting, but I do not see much resemblance. It is, however, for you to determine that question. If you disbelieve the defendant's case—there is no doubt that Mr. Fullam is the executor of Luke Otis—and if he is entitled to anything he is entitled to the amount claimed. If you find for the plaintiff you will find a verdict for Mr. Fullam. If you find a verdict for the defendant, of course that ends the case.

The plaintiff's counsel will hand you a statement of their claim, but of course that does not amount to anything as a matter of proof. It is simply a calculation to save you the trouble of going into figures.

[It is argued by counsel that this claim was not counted among the assets of the decedent. I think counsel for plaintiff has accounted for that when he said that it was a disputed matter, and therefore it was not counted among the assets.] [6]

Verdict and judgment for plaintiff for $1,205. Defendant appealed.

*Errors assigned* were (1) rulings on evidence, quoting the bill of exceptions; (2–6) above instructions, quoting them.

*S. Davis Page*, with him *J. C. Gallen*, for appellant, cited Fullam v. Rose, 160 Pa. 54.

*James E. Gorman*, for appellee.

OPINION BY MR. CHIEF JUSTICE STERRETT, May 3, 1897:

This case was here three years ago on defendant's appeal from the former judgment, and is reported in 160 Pa. 47. Its salient features,—especially as to questions of fact presented by the testimony in the court below,—are substantially the same now as they were then, and hence special reference thereto, in this connection, is unnecessary. On the last as on the former trial, the right of the plaintiff to recover depended on questions of fact which it was the exclusive province of the jury to determine from the somewhat conflicting testimony before them. It was therefore the duty of the learned trial judge to fairly and impartially submit the case on all the evidence with such instructions as were calculated to guard the respective rights of both parties without unduly prejudicing the claims of either. The burden of defendant's complaint is that this was not done. Our consideration of the ruling complained of in the first specification, and of the entire charge, including the excerpts therefrom recited in the second to the sixth specifications, inclusive, has satisfied us that this complaint is not entirely unfounded.

The check referred to in the first specification was erroneously admitted in evidence without proper proof of the signature of Luke Otis, deceased, the alleged drawer thereof; and was afterwards improperly used to the prejudice of the defendant. The check in question having been shown to Michael Rose, one of the defendant's witnesses, on his cross-examination, he was asked: "Is that Luke Otis' signature?" His answer was: "It looks like it." Without asking him whether he believed the signature to be genuine or not, or offering any proof whatever as to its genuineness, the check was offered in evidence and admitted under exception. Subsequently it was used as a test paper for the purpose of contradicting and discrediting defendant's witness. In that part of the charge recited in the second specification, the court, in submitting the check to the jury, said, among other things, "the plaintiff puts in this check of Mr. Otis, and it is for you to make a compari-

son of those signatures." It is scarcely necessary to say that this was clearly erroneous and manifestly prejudicial to the defendant. The answer of the witness that the signature shown him "looks like" the signature of Luke Otis, without more, was wholly insufficient to justify the admission of the check in evidence for any purpose,—especially for the purpose of being used as a test paper. It was not even shown that the witness was sufficiently acquainted with the signature of Luke Otis to express any opinion as to the genuineness of the signature in question; nor was he asked to express any opinion on the subject.

In the third specification the learned trial judge inadvertently stated to the jury that the paper sued on "was found among the belongings of" the plaintiff's testator. This was unwarranted by anything that appears in the testimony. The paper was produced by the plaintiff, but where it was found, or when it came into his possession does not appear. In view of the fact that the inventory filed by plaintiff in the register's office contains no reference to the paper in question, and other circumstances relied on by the defendant, the misstatement of fact complained of cannot be ignored on the ground that it was harmless.

The same mistaken assumption of fact is also involved in the sixth specification, wherein the jury were in substance instructed that the omission, from the inventory, of the paper in suit, was sufficiently accounted for by the statement of plaintiff's counsel, "that it was a disputed matter and therefore it was not counted among the assets." This statement of counsel appears to have been entirely gratuitous. We find nothing in the evidence on which to base it. It was doubtless suggested by him, as part of his own theory of the case, and as affording a possible explanation of the omission. But that did not justify submission of the alleged explanation to the jury as was done. Causes should be tried on the evidence properly before the jury, and not upon theories of counsel, especially when they are unsupported by the evidence. In this case, the learned trial judge appears to have inadvertently given undue prominence and weight to such theories; and the effect was doubtless misleading, and prejudicial to the defendant.

Again, in that part of the charge recited in the fourth speci-

fication; the learned judge, after referring to the paper in suit as evidence in support of plaintiff's claim, proceeded to say there was, "in addition to that, certain corroborative evidence which is based upon the assumed good character of Luke Otis, the deceased," etc. In the absence of testimony on which to base any assumption as to the character of Luke Otis, from which inferences in favor of plaintiff's claim might be drawn by the jury, this suggestion, as to "corroborative evidence," was erroneous as well as misleading. We also think that part of the charge covered by the fifth specification was uncalled for and unwarranted by any evidence in the case.

On the whole, we have no doubt the defendant's case was unintentionally but nevertheless seriously prejudiced by the manner in which it was submitted to the jury. Her defense was payment, in support of which there was direct and positive evidence, corroborated by proof of the testator's admissions, and by other facts and circumstances, some of which at least were clearly established by competent evidence.

It is unnecessary to notice other features of the case, to which attention was called when the case was here before. In the hurry of trial they appear to have been overlooked by the court. As already intimated, the case was peculiarly one for the consideration of the jury. It was their duty to consider and pass upon the credibility of the witnesses, reconcile conflicting testimony, etc.; and to that end it should have been submitted to them fairly and impartially.

Judgment reversed and a venire facias de novo awarded.